IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

THEODORE STREATER, §
Institutional ID No. 1430922, §
SID No. 7383113, §
§
Plaintiff, §
§ CIVIL ACTION NO. 5:19-CV-263-BQ
v. §
§
LORIE DAVIS, *et al.*, §
§
Defendants. §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Proceeding pro se and *in forma pauperis*, Theodore Streater filed this action against numerous Defendant under 42 U.S.C. § 1983, alleging constitutional violations arising from his confinement at the Texas Department of Criminal Justice (TDCJ) Preston E. Smith Unit (Smith Unit). He seeks monetary damages, injunctive relief, and certification of this case as a class action. Am. Compl. 11–12, ECF No. 9.

Streater filed his original Complaint on December 6, 2019, in the United States District Court for the Eastern District of Texas. ECF No. 1. The Eastern District transferred this case to the Lubbock Division of the United States District Court for the Northern District of Texas. ECF No. 4. Streater filed an Amended Complaint on January 2, 2020. ECF No. 9. The United States District Judge granted Streater's Application to Proceed *In Forma Pauperis* (ECF No. 10) and transferred this case to the undersigned United States Magistrate Judge. ECF No. 11. The undersigned thereafter reviewed Streater's Amended Complaint, as well as authenticated records provided by TDCJ, and conducted an evidentiary hearing on March 12, 2020, in accordance with *Spears v. McCotter*, 766 F.2d 179, 181–82 (5th Cir. 1985). ECF No. 24.

Not all parties have consented to proceed before the undersigned magistrate judge. In accordance with the order of transfer, the undersigned makes the following findings, conclusions, and recommendations to the United States District Judge.

## I. Standard of Review

A court must dismiss a complaint filed *in forma pauperis* by a prisoner against a government entity or employee if the court determines that the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2) (2017); *see also* § 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*). A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint has no arguable basis in fact if it rests upon clearly fanciful or baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005). When analyzing a prisoner's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated prison records. *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (explaining that responses to a questionnaire are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical and other prison records if they are adequately identified or authenticated" (internal quotation marks omitted)).

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements

of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). And while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

## II. Background

### A. Streater's Amended Complaint

Streater's Amended Complaint names fourteen Defendants: (1) Lorie Davis, Director TDCJ-CID; (2) Warden A. Gonzalez, Smith Unit Warden; (3) Captain Miller, food service Captain; (4) Officer Flores, food service; (5) Mrs. Harris, Smith Unit Classification Supervisor; (6) Anthony Cubb, Medical Staff Barry B. Telford Unit (Telford Unit); (7) Chaplain Earnest, Smith Unit Chaplain; (8) Mrs. Reimer, Smith Unit Grievance Supervisor; (9) Ms. Rebber, Legal Mail Supervisor; (10) Sergeant K. Vasquez, Smith Unit Safe Prison/PREA Supervisor; (11) Lieutenant Aynes, Smith Unit Lieutenant; (12) Unknown Telford Unit Employees, Classification/Medical/Officers[1]; (13) One Unknown Classification Officer, Smith Unit; and (14) TDCJ. Am. Compl. 1–2.[2] Streater alleges a number of claims against these Defendants, summarized as follows: (1) violation of right to redress grievances; (2) violation of freedom of speech; (3) violation of right to be protected from cruel and unusual punishment; (4) deliberate indifference to serious medical, health, and safety needs; (5) violation of right to equal protection;

---

[1] Two Defendants to this action, Anthony Cubb and the Unknown Telford Unit Employees, are located in the Eastern District of Texas. The District Court should exercise jurisdiction over the claims against these Defendants because, although they are personally located in the Eastern District of Texas, the effects of their alleged actions were felt most prominently while Streater was in the Northern District of Texas at the Smith Unit. The undersigned further notes that the Eastern District of Texas had the opportunity to sever these claims and retain jurisdiction over these Defendants, but chose to instead transfer all claims to this Court after determining that "[a] substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in Dawson County, Texas." *See* ECF No. 4, at 1.

[2] Page citations to Streater's pleadings refer to the electronic page number assigned by the Court's electronic filing system.

(6) violation of right to free exercise of religion; (7) violations of the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA); (8) violation of Religious Land Use and Institutionalized Persons Act (RLUIPA); (9) violation of Safe Prisons Program and Prison Rape Elimination Act (PREA); (10) violation of right to be protected from forced medical treatment; (11) physical pain and suffering; (12) starvation; (13) intentional infliction of emotional distress (IIED); (14) sleep deprivation; and (15) sexual harassment.[3] *Id.* at 10–11.

1. *Streater's Transfer to the Smith Unit and Modification of Medical Restrictions and Work Assignment*

Streater's claims begin with his transfer from the Telford Unit to the Smith Unit in November 2019. *Id.* at 4. He alleges that Defendants Cubb, Harris, Unknown Telford Employees, and One Unknown Classification Officer conspired to retaliate against him for pursuing litigation in a case filed in the Eastern District of Texas (Civil Action No. 9:15-cv-00068-MJT) and an associated appeal to the Fifth Circuit (No. 18-40870). *Id.* Streater avers that his transfer was done "[u]nder the guise of protecting [him] from suffering heat-related illness," and that Defendants ultimately placed him in the "High Security" section of the Smith Unit. *Id.* Streater states, however, that he has no heat-related medical restrictions. *Id.*

Streater further asserts that, upon his transfer to the Smith Unit, he had multiple medical restrictions that included limitations on reaching above his shoulder, bending at the waist, lifting more than twenty pounds, and standing, and that he required both lower bunk and ground floor housing. *Id.* Streater alleges that on November 11, 2019, roughly a week after his transfer from the Telford Unit, Defendant Cubb "accessed my computerized medical record and deleted my medical restrictions." *Id.* at 4–5. Streater claims that, due to the removal of these restrictions,

[3] Notably, Streater's Amended Complaint contains no corresponding factual allegations for a number of his claims, including those for IIED and the alleged violation of his equal protection rights.

Defendant Harris transferred him from his medically restricted work detail to a high security work squad, and that his new assignment made him "vulnerable to abuse and assaults by officers with no other prisoners as witnesses."[4] *Id.* at 5. Streater states that Cubb never examined him prior to the removal of his restrictions and indicates that, on November 14, 2019, Dr. Kristy McClure restored his upper extremities limitations. *Id.* Streater alleges, however, that Defendant Harris "refused" to return him to his medically-restricted work assignment. *Id.* Streater claims that Defendants Cubb, Harris, Unknown Telford Unit Employees, and One Unknown Classification Officer were deliberately indifferent to his medical, health, and safety needs, and that they conspired to retaliate against him for "exercising [his] right to Redress of Grievance[s]." *Id.*

*2. ADA and RA Allegations*

Streater alleges that he is disabled within the meaning of the ADA.[5] *Id.* at 6. Streater avers that Defendants Davis, TDCJ, Cubb, Harris, Unknown Telford Unit Employees, and One Unknown Classification Officer have discriminated against him because of his disability. *Id.* Streater provides an extensive list of benefits to which he claims Defendants have denied him access, specifically: (1) "Housing commensurate with [his] classification level"; (2) a "[c]ellmate within 10 to 15 years of [his] age range"; (3) "Recreation facilities commensurate with [his] classification level"; (4) "Food service equal to the quality received by nondisabled TDCJ prisoners of [his] classification level"; (5) "Food service commensurate with [his] religious dietary restrictions"; (6) "Food service commensurate with [his] medical dietary restrictions"; (7) "Rights, privileges, and protections under the Safe Prisons/PREA Act"; (8) "Work assignment

[4] Streater does *not* allege that any officers ever assaulted him during this period.

[5] Streater does not specify the nature of his alleged disability in his Amended Complaint, nor does he specifically allege that he is disabled within the meaning of the RA; nevertheless, he seeks to bring claims pursuant to the RA. For screening purposes the undersigned assumes, without deciding, that he has alleged such a disability.

commensurate with [his] medical restrictions"; and (9) "Unit assignment commensurate with ADA and Rehabilitations Acts." *Id.* Streater further asserts that these Defendants "conspired" to discriminate against him by placing him in a "High Security" facility while placing other similarly situated offenders—heat restricted inmates with a minimum-security classification—in lower security housing. *Id.* Streater also claims that Defendants Davis and TDCJ discriminated against him by "forcing" him to accept heat restricted housing and not giving him the opportunity to "opt out." *Id.*

*3. Cell Assignment and Conditions*

Streater alleges that Defendants Gonzalez, Miller, Flores, Harris, Vasquez, Aynes, and One Unknown Classification Officer violated his rights under the ADA, RA, RLUIPA, and the Safe Prisons/PREA by: (1) interfering with the free exercise of his religion; (2) failing to protect him from cruel and unusual punishment; and (3) demonstrating deliberate indifference to his health and safety. *Id.* at 7. Streater complains that Defendant Harris assigned him to a cellmate twenty-five years his junior, who was mentally unstable and subjected him to sleep deprivation, sexual harassment, and "reckless endangerment." *Id.* Streater also avers that his placement as a G3 offender with G4 offenders and inmates with mental health issues who exhibit "erratic behavior and delusional state[s] of mind" put him in danger. *Id.* Streater further alleges that his cell is unsanitary and unsafe, claiming it is infested with insects and has (1) poor ventilation, (2) an inoperable "call for help system," (3) unvented cell doors, (4) cell doors that cannot be opened by the computer system, and (5) a shower and toilet "contaminated with built up scum, feces [and] mold with no cleaning agents to sanitize [them]." *Id.*

*4. Religious and Dietary Accommodations*

Streater claims that Defendants Miller, Flores, Gonzalez, and Earnest have violated his right to free exercise of his religion by not ensuring that he receives a pork-free diet complying with his Islamic beliefs. *Id.* Streater also avers that these Defendants have not established policies assuring that inmates with religious dietary restrictions receive (1) diets that accommodate their beliefs and (2) meal delivery on Fridays with sufficient lead time prior to Jumu'ah (Friday prayer) to avoid Muslims having to choose between attending prayer or eating. *Id.* at 7–8. Streater further alleges that Defendants Gonzalez, Flores, Miller, and TDCJ do not have policies in place to make certain that prisoners, such as himself, who have medically-imposed dietary restrictions (i.e., allergy to peanuts), receive meals that comply with those limitations. *Id.*

*5. Grievance Procedures and Other Claims*

With respect to grievance procedures, Streater first alleges that Defendant Reimer "fails to process offender grievances" and that Defendants Davis, Reimer, and TDCJ have not established policies to ensure prisoners are provided a log number for their grievances. *Id.* at 8. Streater further avers that Defendant Aynes has made the grievance process unavailable through "physical assaults" and "the threat of physical assaults in retaliation for filing grievances." *Id.* at 9. With respect to food distribution, Streater claims that Defendants Gonzalez, Miller, Flores, and TDCJ failed to create policies that assure meals provided by food carts are distributed in a manner that complies with "food safety and sanitary regulations and conditions." *Id.* at 8. Streater also complains that the quality of food service in ECB housing is not "the same quality of food service and menu items (such as coffee and certain dessert items)" as provided to inmates in non-ECB housing. *Id.* Finally, Streater claims that Defendant Rebber violated his rights by opening a letter he sent to a Texas Tribune reporter. *Id.* at 9.

*6. Allegations Incorporated by Reference*

Streater's Amended Complaint also sought to incorporate by reference numerous allegations from his original Complaint. *Id.* at 10. The bulk of these allegations are redundant or contribute nothing to the legal viability of Streater's claims. The undersigned notes, however, a few additional allegations requiring mention. First, Streater alleges that the lights in his cell are never off for more than two hours at a time during the night, and his attempts to turn the lights off in his cell are overridden by unnamed officials. ECF No. 1, at 9. As a result, Streater claims he is unable to get more than an hour of uninterrupted sleep because the lights are either turned on and off or simply left on. *Id.* Second, Streater avers that, upon his arrival at the Smith Unit, he weighed 185 pounds, but that when he was weighed six days later on November 12, 2019, he weighed 171 pounds.[6] *Id.* at 11.

**B. Authenticated Records**

The authenticated records confirm some of Streater's assertions. For example, a report dated November 11, 2019, states that Dr. Anthony Cubb deleted various medical restrictions in Streater's file, including those related to reaching above his shoulder, bending at the waist, lifting more than twenty pounds, and standing. The records further show that, on November 14, 2019, Kristy McClure-Williams reinstated Streater's upper-body medical restrictions. They also reflect that, at least until December 5, 2019, Streater was assigned to a high security work detail. Nothing in the authenticated records indicates why TDCJ transferred Streater to the Smith Unit or that he has medical restrictions related to heat exposure.

---

[6] As discussed below, the authenticated records do not support this contention. According to the authenticated records, Streater weighed 180 pounds on November 7, 2019, and 174 pounds on November 14, 2019.

With respect to Streater's weight, the records conflict with Streater's allegations. They show that, on November 7, 2019, Streater weighed 180 pounds. A week later, Streater weighed 174 pounds. Since then, Streater's weight has stabilized and hovers between 171.8 pounds and 177 pounds, with his most recent weigh-in occurring January 10, 2020, and showing a weight of 174.5 pounds.

### C. Streater's *Spears* Testimony

The Court conducted a *Spears* hearing March 12, 2020, to further develop the factual basis for his claims. *See* ECF No. 24. In reference to retaliation, Streater testified that he brings these claims against Defendants Reimer, Davis, and Aynes. Tr. 1:53:15–:45. Streater averred that he has filed grievances while at the Smith Unit, including one around the end of November 2019, but that they "disappear" and are never addressed. Tr. 1:53:50–:54:02, 1:54:30–:55:30. Per his testimony Streater has filed one grievance at the Smith Unit, concerning a typewriter that broke during shipping from the Telford Unit, and that TDCJ officials never responded. Tr. 1:54:15–30, 1:55:00–:10. Streater claims that the grievance processes have been made "unavailable" to him because TDCJ does not provide log numbers to track grievances. Tr. 2:02:20–:38. Streater also stated he felt Defendant Aynes was making a "personal threat" when, on the day of his arrival, he saw Defendant Aynes use force against another inmate and that, while standing close to Streater and a dozen other inmates, Defendant Aynes said this was how grievances were dealt with. Tr. 2:02:38–:04:05. This was the only time Streater alleges he personally witnessed Defendant Aynes assault someone for filing a grievance (Tr. 2:05:25–:50), and Streater agreed Aynes has never assaulted him for filing a grievance. Tr. 2:05:55–:06:20.

Streater stated during the *Spears* hearing that he was withdrawing his claims that he had been denied access to the courts and that Defendant Rebber violated his rights by opening a letter to a Texas Tribune reporter. Tr. 2:08:00–:10:45.

As for his religious exercise claims regarding a pork-free diet and attending Jumu'ah (Friday Prayer) (Tr. 2:10:45–:11:10), Streater testified that, upon arrival at the Smith Unit, he missed roughly ten to fifteen meals, sometimes two meals per day, because he did not receive pork-free food. Tr. 2:11:10–:12:15. According to Streater, unnamed officials told him that not eating pork was a "choice" and not a medical restriction, so they would not provide pork-free meals, and that if he wanted to be placed on a list of inmates who receive pork-free meals, he needed to write the Warden's secretary. Tr. 2:13:10–:30. Streater claimed that it took roughly two months to be placed on a pork-free meal list. Tr. 2:14:08–:15. Streater further testified he again experienced difficulties obtaining pork-free meals in February and March 2020 when he did not receive a pork-free meal three or four times during February and twice in March. Tr. 2:16:55–:17:15. With respect to Jumu'ah, Streater stated that inmates are removed from their cells for Friday morning prayers around 10:30, and because the food cart sometimes arrives while inmates are attending services, they cannot eat lunch, thus requiring them to choose between eating and going to religious services. Tr. 2:19:00–:20:40. According to Streater, this "happens every Friday." Tr. 2:21:20–25. Streater testified that he has tried to speak with Chaplain Earnest and Assistant Warden Miller, but those discussions have never led to any changes. Tr. 2:21:25–:22:10.

Turning to Streater's retaliation claims against Defendants Cubb, Harris, Unknown Telford Unit Employees, and One Unknown Classification Officer (Tr. 2:22:51–:23:30), Streater testified that he filed a Notice of Appeal (in a pending Eastern District case) in September 2018 and was transferred to the Smith Unit on November 6, 2019. Tr. 2:23:40–:24:20. Streater explained the

nature of his litigation in the Fifth Circuit, which related to grievances he filed against numerous officers at the Eastham Unit and eventually led to his allegedly retaliatory transfer to the Telford Unit in order to "break" him. Tr. 2:25:10–:50. Streater testified that he has since been transferred to a high security wing at the Smith Unit, placed in the ECB—heat restriction—program and, less than a week after his transfer, Defendant Cubb removed his medical restrictions. Tr. 2:25:50–:26:55. Streater further stated that he did not understand why he had been transferred to the Smith Unit and the ECB program if he did not have any medical restrictions. Tr. 2:26:55–:27:10. Streater testified that a Smith unit official told him TDCJ made the decision to transfer Streater from Telford Unit to Smith Unit. Tr. 2:28:40–:55. Although Streater does not know who made the decision to move him from Telford to Smith, he believes the transfer was retaliatory and related to his litigation because the only reason he has been given for his transfer is that he has heat restrictions. Tr. 2:29:08–:30:15. Streater's only ground for believing that Defendant Cubb was motivated by retaliatory purpose in removing Streater's medical restrictions is that "there is no other reason he should have done it." Tr. 2:30:30–:58. Streater testified that his medical restrictions were reinstated three days after their removal, but he further claimed that it took three to four additional weeks before he returned to his medically restricted work assignment, after being removed due to a lack of medical restrictions. Tr. 2:30:58–:32:00.

Streater accused Defendant Harris, a work classification supervisor, of "working with" the classification officer that he is suing in his Fifth Circuit litigation, but he proffered no facts supporting this assertion. Tr. 2:32:50–:34:40. Streater claims that, prior to being returned to his medically-restricted work assignment, he was made to perform work he could not do that exacerbated his neck and back problems and caused significant pain. Tr. 2:36:10–:37:00. When asked who made the decision regarding his work assignment, Streater testified he did not know

(although he claimed to have told the classification department of his restrictions), and that he simply received an unsigned response from the classification department stating he did not have any restrictions. Tr. 2:38:15–:39:02. With respect to his job assignment, Streater also alleged that it made him vulnerable to abuse, although he admitted no assault actually occurred. Tr. 2:39:02–:39:25.

As to Streater's food allergy claims, Streater confirmed that he was bringing these claims against Defendants Gonzalez, Miller, and Flores. Tr. 2:40:00–:30. Streater testified that he receives a lunch tray and dinner tray every day that has either a bean or peanut product on it (to which he claims he is allergic) (Tr. 2:40:30–:50, 2:41:10–:30), but has never had an allergic reaction at the Smith Unit because he does not eat the allergy inducing food. Tr. 2:40:50–:41:10. Streater testified that he can and does eat everything else on the tray. Tr. 2:41:51–:58. Streater also stated that he compensates for not being able to eat all the food provided by eating junk food that his family orders for him. Tr. 2:42:27–:40, 2:43:25–:31. Streater alleges that this harms him because he is "not getting what [he] is entitled to." Tr. 2:43:05–:15.

Concerning his conditions of confinement claims, Streater confirmed he was naming Gonzalez, Miller, Flores, Vasquez, Aynes, and Harris as Defendants in reference to these claims. Tr. 2:46:50–:47:30. Streater testified that he felt like his cellmate, Christopher Guthrie, was trying to sexually assault him by hugging him two or three times, and that on another occasion an inmate threatened him in the dayroom but did not make physical contact with him. Tr. 2:49:00–:51:10. With respect to the conditions of his cell, Streater testified that it was "extremely filthy," with cockroaches, ants, fecal matter on the toilet, and mold on the shower floor, and that he was not provided any cleaning supplies for the cell. Tr. 2:52:25–:53:00. Streater alleged "a lot of psychological harm" arising from having to reside in these conditions and claimed that he became

sick a few times—coughing, sore throat, and breathing problems—but Streater is uncertain that these issues were caused by the cell's conditions, although he did claim that the problems stopped after he was transferred to another cell. Tr. 2:54:00–:56:45.

Streater also provided testimony regarding general food service at the Smith Unit. He testified that the kitchen failed two health inspections in two months (Tr. 2:56:58–:10) and that he believes the process of serving food is unsanitary. Tr. 2:57:10–:20. Streater claims the food cart is "never washed," and that inmates serving the food are not medically cleared, do not wash their hands, and fail to wear gloves or hairnets. Tr. 2:57:20–:58:00. Streater claimed that he has gotten sick a few times—flu-like symptoms and stomach aches—but he does not know if it was caused by food contamination. Tr. 2:58:55–3:00:00. Regarding food quality, Streater asserted that food is served cold and often congealed, and that he is being treated like a disciplinary offender, with the general population inmates receiving better quality food and hot meals. Tr. 3:00:00–:01:20.

As to his sleep deprivation claim, Streater testified that the lights in cells at the Smith Unit stay on after 10:30 p.m., are turned off for only about an hour at a time each night, and are frequently turned on to perform counts (among other things). As a result, Streater claims he only gets roughly two hours of sleep per night. Tr. 3:02:29–:04:30. Streater claims to suffer migraines and vision problems due to lack of sleep. Tr. 3:04:40–:05:05.

With respect to alleged forced medical treatment, Streater explained that his claim is based on placement in ECB heat restricted housing without the required restriction necessitating such placement, and that he was not allowed to "opt out" of such an assignment. Tr. 3:06:15–:08:20. Streater further testified, however, that he did not know whether he qualified for heat-restricted housing. Tr. 3:08:30–:09:50.

As to Streater's remaining claims, Streater informed the Court that his sexual harassment claim referenced his cellmate attempting to hug him. Tr. 3:11:27–:42. Streater further testified that his "pain and suffering" and IIED claims arose out of the facts already discussed during the hearing as to the other specific claims. Tr. 3:11:42–:12:15. Streater also stated that his equal protection claim is based on the testimony already provided during the hearing, as well as the fact that inmates housed in high security facilities do not have access to the same or similar privileges as those provided to the general population, and what Streater generally referred to as the "overall treatment" of being housed in a building for high security offenders. Tr. 3:12:18–:15:00.

Streater finally averred that his ADA and RA claims are based on the same facts already provided, but that he is simply bringing those claims under a different statute. Tr. 3:15:47–:16:11. Streater could not point to an identifiable disability under either statute; instead, he pointed to the unknown medical condition that required his placement in ECB housing and asserted that they are treating him as if he is disabled within the meaning of the ADA and RA. Tr. 3:16:12–:17:15.

## III. Discussion

Streater's claims are a complex and tangled weave of factual allegations tied to his transfer from the Telford Unit to the Smith Unit and the conditions under which he has been confined since arriving there. The District Court should dismiss the vast majority of them as frivolous and for failure to state a claim; however, one claim survives screening and requires an answer from that Defendant.

### A. The District Court should dismiss Streater's claim against Defendant Rebber because Streater has abandoned that claim.

During the *Spears* hearing, Streater testified that he no longer wished to pursue his claim against Defendant Rebber for allegedly violating his rights pertaining to a letter he sent to a

reporter. Tr. 2:08:00–:10:45. As such, the District Court should dismiss the claim without prejudice.

**B. The District Court should dismiss Streater's claims related to the grievance process because he has no constitutionally protected right to such a procedure.**

Streater alleges violations of his rights pertaining to the grievance process at the Smith Unit. Specifically, he claims that Defendants Reimer, Davis, and Aynes have made the grievance process "unavailable" in a variety of ways, including by failing to process grievances, not providing log numbers for grievances, and threatening violence for filing grievances. Am. Compl. 8–9; Tr. 1:53:29–54:02, 1:54:30–:55:30, 2:02:20–:38, 2:02:38–:04:05. Streater avers that he felt Defendant Aynes threatened him when he witnessed a use of force against another inmate and Aynes told those watching this was how officers dealt with those filing grievances at the Smith Unit. Tr. 2:02:38–:04:05. Streater does not claim, however, that Defendant Aynes ever actually assaulted him in response to Streater filing a grievance. Tr. 2:05:55–:06:20.

With respect to the grievance process itself, Streater's allegations are frivolous and fail to state a viable constitutional claim because he does not possess a constitutional right to have grievances resolved to his satisfaction. *See, e.g.*, *Garrett v. Stephens*, 675 F. App'x 444, 447 (5th Cir. 2017) (citing *Geiger*, 404 F.3d at 374) (explaining that a prisoner "does not have a constitutional right to have grievances resolved in his favor or to have his claims reviewed per a grievance process that is responsive to his perceived injustices; thus, the denials of his grievances do not implicate his constitutional rights or give rise to a § 1983 claim against [defendant]"); *Morris v. Cross*, 476 F. App'x 783, 785 (5th Cir. 2012) (rejecting appellant's claim that prison official's failure to conduct an adequate investigation into his grievance implicated due process concerns "because [appellant] lacks a protected interest in a favorable resolution to his grievances"); *Aron v. Green*, No. 4:14–CV–109–A, 2014 WL 1917543, at *2 (N.D. Tex. May 12,

2014) ("Denying plaintiff's grievances, or failing to resolve them in the manner preferred by plaintiff, is not a violation of plaintiff's constitutional rights."); *Dugas v. Cain*, Civil Action No. 09–0177–BAJ–CN, 2010 WL 4695313, at *5 (M.D. La. Oct. 20, 2010) (finding that "any claim regarding the alleged failure of the defendants to properly address, investigate or respond to [prisoner's] complaints or administrative grievances regarding his medical care is without legal foundation"), *R. & R. adopted by* 2010 WL 4704446 (M.D. La. Nov. 12, 2010).

More fundamentally, neither does Streater possess a liberty interest in having access to a prison grievance procedure. *Geiger*, 404 F.3d at 374; *see also Johnson v. Cheney*, 313 F. App'x 732, 733 (5th Cir. 2009) (noting that a prisoner may be said to have exhausted his administrative remedies under the Prisoner Litigation Reform Act where "prison officials ignore or interfere with a prisoner's pursuit of grievance relief"). "Although an adequate grievance procedure is a condition precedent to filing a suit arising under § 1983, *see* 42 U.S.C.1997e(a), its ineffectiveness or altogether absence does not give rise to a constitutional claim." *Giddings v. Valdez*, Civil Action No. 3:06-CV-2384-G, 2007 WL 1201577, at *3 (N.D. Tex. Apr. 24, 2007). Thus, even accepting as true Streater's allegations that Defendant Reimer failed to process his grievances or otherwise destroyed them, or that Defendant Davis has not established a policy pertaining to log numbers for grievances, Streater cannot state a claim of constitutional dimension for such conduct.

Further, Defendant Aynes's purported threatening of Streater does not violate Streater's constitutional rights. The Fifth Circuit has long recognized that verbal threats or harassment by a correctional officer do not provide the basis for a viable § 1983 claim. *Robertson v. Plano City*, 70 F.3d 21, 24 (5th Cir. 1995) (citing *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983)); *see Rader v. Lubbock Cty.*, No. Civ.A. 5:01-CV-258-C, 2003 WL 21145788, at *13 (N.D. Tex. Apr. 25, 2003) (quoting *Robertson*, 70 F.3d at 24) (dismissing prisoner's claim that defendant verbally

taunted and threatened him because "mere threatening language and gestures of a custodial office[r] do not, even if true, amount to constitutional violations"). Verbal threats, abusive language, or other harassment, "while unprofessional and inexcusable, are simply not sufficient to state a constitutional claim under 42 U.S.C. § 1983." *Johns v. Miller*, No. Civ.A. 05-2489, 2005 WL 3592248, at *7 (E.D. La. Oct. 26, 2005) (citing *Slagel v. Shell Oil Refinery*, 811 F. Supp. 378, 382 (C.D. Ill. 1993), *aff'd*, 23 F.3d 410 (7th Cir. 1994)); *see also Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (holding that a sheriff's threat to hang a prisoner did not constitute an actionable claim under § 1983). The District Court should therefore dismiss Streater's claims against Defendants Reimer, Davis, and Aynes pertaining to the grievance process and any alleged threats made to Streater regarding the filing of grievances.

**C. The District Court should dismiss Streater's claims regarding PREA because PREA does not provide a private cause of action.**

Among Streater's numerous allegations is a claim that Defendant Vasquez (and presumably others), who Streater identifies as the Smith Unit Safe Prison/PREA Supervisor, violated Streater's rights under PREA. Am. Compl. 2, 7. Streater cannot bring a claim against Defendant Vasquez or anyone else for purported PREA violations. "The Fifth Circuit has expressly found that the PREA does not create a private right of action." *Molina v. Wise Cty.*, CIVIL ACTION 4:17-CV-809-Y, 2019 WL 802060, at *4 (N.D. Tex. Feb. 21, 2019) (citing *Krieg v. Steele*, 599 F. App'x 231, 232–33 (5th Cir. 2015)), *appeal dismissed by* No. 19-10304, 2019 WL 4318499 (5th Cir. June 17, 2019). As such, Streater's claim premised on alleged PREA violations should be dismissed.

**D. The District Court should dismiss Streater's conditions of confinement claims because they are frivolous and fail to state a claim upon which relief can be granted.**

Streater's claims and allegations pertaining to the conditions under which he has been confined in the Smith Unit are numerous, tangled, and often confusing. The undersigned's analysis focuses on those claims discernable from a liberal construction of Streater's Complaint and his *Spears* hearing testimony: (1) housing classification and cellmate's conduct (Am. Compl. 7; Tr. 2:49:00–:51:10, 3:11:27–:42); (2) allegedly filthy cell conditions (Am. Compl. 7; Tr. 2:52:25–:50, 2:54:00–:56:45); (3) food quality (Am. Compl. 8; Tr. 2:56:58–3:01:20); (4) placement in heat-restricted housing, which allegedly constitutes a form of forced medical treatment (Am. Compl. 6, 11; Tr. 3:06:15–:08:20); and (5) sleep deprivation arising from cell lights being turned on and off at night. Am. Compl. 11; ECF No. 1, at 9; Tr. 3:02:29–:05:05.

*1. ECB Assignment, Housing Classification, and Cellmate*

Streater complains that his placement in a unit for inmates with heat restrictions, without him having the required medical requirement or being provided an opportunity to "opt out" of such housing, constitutes "forced medical treatment." Am. Compl. 6; Tr. 3:06:15–:08:20. He further alleges that he should not be placed in high security housing with individuals he believes pose a threat to his safety and because he is a minimum-security offender. Am. Compl. 7. Streater additionally claims that he was previously housed with a cellmate who allegedly sexually harassed and assaulted Streater by attempting to hug him on two or three occasions, and that a different inmate threatened—but did not assault—him in the dayroom. Tr. 2:49:00–:51:10, 3:11:27–:42.

Insofar as Streater seeks to bring a claim based on his housing assignment in general, including his placement at the Smith Unit in heat-restricted housing rather than another facility, that claim should be dismissed as frivolous. "'[A] prison inmate does not have a protectable liberty or property interest in his custodial classification' and does not have a constitutional right to be

housed in a particular facility." *Humphrey v. Banks*, 777 F. App'x 767, 768 (5th Cir. 2019) (quoting *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir. 1995)) (affirming district court's dismissal as frivolous prisoner's claim concerning placement in unit that housed gang-affiliated inmates); *see Meachum v. Fano*, 427 U.S. 215, 224 (1976) (stating that "[t]he Constitution does not . . . guarantee that the convicted prisoner will be placed in any particular prison," and holding that transfer from medium security facility to maximum security facility did not implicate due process rights); *Boudreaux v. Foti*, No. 95-30217, 1995 WL 581982, at *1 (5th Cir. Sept. 26, 1995) (citing *Maddox v. Thomas*, 671 F.2d 949, 950 (5th Cir. 1982)) ("An inmate generally has no constitutional right to be imprisoned in any particular institution, even if life in one institution is less desirable."); *Lerma v. Savage*, 534 F. Supp. 462, 469 (S.D. Tex. 1982) (explaining that prisoners have no right to housing at a particular TDCJ facility, and classification of prisoners is a discretionary function of TDCJ officials). Thus, to the extent Streater attempts to claim a constitutional violation based on his housing assignment in the Smith Unit, ECB, or a high-security facility, he fails to state a cognizable claim.

Streater's allegations could also be construed as setting forth a failure to protect claim, as he alleges his safety was endangered by his placement and cellmate assignment. Any such claim, however, would similarly fail. "It is well settled that the Eighth Amendment's proscription against cruel and unusual punishment requires prison officials to protect inmates from violent attacks by other inmates." *Glenn v. Barber*, Civil Action No. 2:12-CV-00237, 2013 WL 2458622, at *6 (S.D. Tex. June 5, 2013) (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)).

> In order for prison officials to be held liable under the Eighth Amendment for failure to protect, a prisoner must prove that the official knew of and disregarded an excessive risk to the inmate's safety; was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and also drew the inference; and failed to take reasonable remedial action.

*Id.* However, "[a] failure to protect claim that fails to allege any resulting physical injury does not state an Eighth Amendment violation entitling a prisoner to compensatory damages." *Id.* at *7. In this case, Streater alleges no physical injury whatsoever with respect to his housing alongside other inmates he considered dangerous. Streater alleges that one inmate verbally threatened him, and that his cellmate made two or three attempts to hug him, which Streater construed as attempts at sexual assault; however, Streater alleges no facts showing that he ever experienced physical injury or harm from these events. Tr. 2:49:00–:51:10, 3:11:27–:42. As such, the District Court should dismiss Streater's claims pertaining to conditions of confinement arising from his housing assignment.

*2. Cell Conditions and Food Quality*

Streater complains of alleged filthy conditions in his cell, which he says included fecal matter in the toilet, mold in the shower, and ants and cockroaches in his cell. Am. Compl. 7; Tr. 2:52:25–:50. He also finds fault with the quality of food served, as well as the manner in which it is served, alleging that the food cart is not washed, inmates serving food do not wash their hands or wear gloves or hairnets, and the food is often cold and congealed. Tr. 2:56:58–3:01:20. Streater claims he has had flu-like symptoms and stomach aches on occasion but admits he does not know if these maladies were caused by food contamination. Tr. 2:58:55–3:00:00.

While the Constitution does not mandate comfortable prisons, it does require humane ones, and the Eighth Amendment governs the conditions under which inmates are confined. *Reagan v. Burns*, Civil Action No. 3:16-CV-2590-G-BH, 2019 WL 6733023, at *13 (N.D. Tex. Oct. 30, 2019) (quoting *Wilson v. Lynaugh*, 878 F.2d 846, 849 (5th Cir. 1989)), *R. & R. adopted by* 2019 WL 6729085 (N.D. Tex. Dec. 10, 2019). Only those officials who know of and disregard "an

excessive risk to inmate health or safety" are liable under the Eighth Amendment for denying inmates humane conditions of confinement. *Farmer*, 511 U.S. at 837.

> A constitutional violation . . . occurs only when two requirements are met. First, there is an objective requirement that the condition must be so serious as to deprive prisoners of the minimal civilized measure of life's necessities, as when it denies the prisoner some basic human need. Second, under a subjective standard, we must determine whether the prison official responsible was deliberately indifferent to inmate health or safety.

*Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) (per curiam) (internal citations and quotation marks omitted). Deliberate indifference "is an extremely high standard to meet." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (internal quotation marks omitted).

> To establish deliberate indifference in the context of the Eighth Amendment, the prisoner must show that the defendants (1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed.

*Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998). Additionally, a prison official's "failure to alleviate a significant risk that the official should have perceived, but did not, is insufficient to show deliberate indifference." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Farmer*, 511 U.S. at 838) (alterations and internal quotation marks omitted). "[D]eliberate indifference cannot be inferred merely from negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Lawson v. Dall. Cty.*, 286 F.3d 257, 262 (5th Cir. 2002) (holding that deliberate indifference is a "subjective inquiry," and inmate must show prison official was actually aware of risk of harm and consciously ignored it).

Finally, a prisoner in a conditions of confinement case "must demonstrate not only that he was exposed to a substantial risk of serious harm, but that he actually suffered some harm that was more than *de minimis*." *Reagan*, 2019 WL 6733023, at *13 (citing *Alexander v. Tippah Cty.*, 351 F.3d 626, 630–31 (5th Cir. 2003)); *see also Mayes v. Travis State Jail*, No. 07-51086, 2008 WL 4657078, at *1 (5th Cir. Oct. 22, 2008) ("A prisoner seeking to recover damages on a conditions of confinement claim must establish a physical injury that is more than de minimis.").

In evaluating conditions of confinement claims, courts recognize that "the Constitution does not mandate prisons with comfortable surroundings or commodious conditions" (*Talib v. Gilley*, 138 F.3d 211, 215 (5th Cir. 1998)), and that it does not protect prisoners from those conditions that cause "discomfort or inconvenience." *Wilson*, 878 F.2d at 849. Indeed, the Fifth Circuit, following the Seventh Circuit's lead, has noted that "[i]nmates cannot expect the amenities, conveniences and services of a good hotel . . . ." *Id.* at 849 n.5 (quoting *Harris v. Fleming*, 839 F.2d 1232, 1235–36 (7th Cir. 1988)). "The Constitution does not require that prisons be completely sanitized or as clean or free from potential hazards as one's home might be." *McAllister v. Strain*, Civil Action No. 09-2823, 2009 WL 5178316, at *3 (E.D. La. Dec. 23, 2009). Similarly, the mere presence of insects in a cell does not violate a prisoner's constitutional rights. *See Armour v. Davis*, CIVIL ACTION NO. 6:18cv535, 2020 WL 2850140, at *14 (E.D. Tex. June 1, 2020) (collecting cases finding that prisoner being housed in cell with pest problems did not violate the Constitution).

Streater's claims should be dismissed because he has not demonstrated that the conditions in his cell deprived him "of the minimal civilized measure of life's necessities." *Woods*, 51 F.3d at 581; *see also Bush v. Monroe*, CIVIL ACTION NO. 6:17cv541, 2018 WL 4648732, at *3 (E.D. Tex. July 30, 2018) (concluding that "[e]ven if [prisoner] had asserted that he was housed in a cell

with black mold, broken windows, water leaks, and critters, he would still fail to demonstrate a constitutional violation"), *R. & R. adopted by* 2018 WL 4042418 (E.D. Tex. Aug. 24, 2018). Further, Streater's allegations do not demonstrate *deliberate indifference* on the part of any named Defendant. As noted above, deliberate indifference requires subjective knowledge on the part of the prison officials regarding an excessive risk to Streater's health and safety arising from the conditions of confinement. *Bradley*, 157 F.3d at 1025. Streater does not allege that any Defendant knew of (1) the conditions in which he was housed *and* (2) a specific risk they posed to his safety. At best, Streater has set forth a claim for negligence, in that Defendants perhaps *should have known* about the conditions in his cell, but negligence is inadequate to demonstrate deliberate indifference. *Domino*, 239 F.3d at 756. As such, the District Court should dismiss Streater's claims pertaining to his cell's allegedly unsanitary conditions. *See Reagan*, 2019 WL 6733023, at *14 (recommending dismissal because inmate did not allege that any named defendant was subjectively aware of any risk to inmate's health or safety); *Morrison v. Bench*, No. 3:09-CV-1003-N, 2009 WL 4858066, at *4 (N.D. Tex. Dec. 14, 2009) (dismissing prisoner's conditions of confinement claim because, even if prisoner's allegations demonstrated an objective risk of harm, he did not adequately allege that prison officials knew of the risks and disregarded them).

Finally, the undersigned notes that Streater has not alleged a harm greater than *de minimis*—in this case, coughing, sore throat, and breathing difficulties—arising from his being housed in the conditions at issue. This deficiency provides another, and independent, basis upon which the District Court should dismiss Streater's claim. *See Young v. LeBlanc*, CIVIL ACTION NO. 19-13516, 2020 WL 3421132, at *24 (E.D. La. May 7, 2020) (concluding that a cold/fever, coughing, sneezing, runny nose, and sore throat were *de minimis* physical injuries), *R. & R. adopted by* 2020 WL 3415800 (E.D. La. June 22, 2020).

"With regard to food service, prisons are required to provide nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Armour*, 2020 WL 2850140, at *13 (internal quotation marks omitted). Absent an allegation of resulting harm, "complaints regarding food service practices simply are not of a constitutional dimension." *Id.* at *14 (internal quotation marks omitted). Additionally, there is no constitutional right to hot meals. *Urias v. Ground*, Civil Action No. 5:11cv142, 2011 WL 6318553, at *4 (E.D. Tex. Oct. 17, 2011), *R. & R. adopted by* 2011 WL 6318550 (E.D. Tex. Dec. 15, 2011). Streater merely claims to have suffered flu-like symptoms and stomach aches, but he is uncertain as to whether the alleged food contamination caused those ailments. Tr. 2:58:55–3:00:00. As a result, Streater's claims related to food preparation and distribution should also be dismissed. *See Armour*, 2020 WL 2850140, at *13 (holding that generalized claims of becoming ill after eating allegedly unsanitary food were not sufficient to state a claim).

*3. Sleep Deprivation*

Streater alleges that he has been subjected to sleep deprivation due to the lights in his cell being turned on at various times throughout the night, causing him to only be able to sleep for roughly one hour at a time. ECF No. 1, at 9; Am. Compl. 10; Tr. 3:02:29–:04:30. Streater claims these conditions have led to migraines and vision problems. Tr. 3:04:40–:05:05.

The Fifth Circuit has held that, under the Eighth Amendment, sleep deprivation may "constitute a denial of the minimal civilized measure of life's necessities." *Garrett v. Thaler*, 560 F. App'x 375, 379 (5th Cir. 2014) (internal quotation marks omitted). Streater's claim of sleep deprivation, however, fails for two reasons. First, he does not name *any* Defendant responsible for his alleged sleep deprivation, i.e., someone who operates the lights. At most, he references a

"control picket" that overrides his attempts to turn off the lights. ECF No. 1, at 9. Second, even if he did name a Defendant who he claimed was responsible for his sleep deprivation, he has not alleged that they were subjectively aware of his being deprived of sleep *and* any risks to his health associated with such deprivation. *See Reagan*, 2019 WL 6733023, at *14 (recommending dismissal because inmate did not allege that any named defendant was subjectively aware of any risk to inmate's health or safety); *Morrison*, 2009 WL 4858066, at *4 (dismissing prisoner's conditions of confinement claim because, even if prisoner's allegations demonstrated an objective risk of harm, he did not adequately allege that prison officials knew of the risks and disregarded them). In addition, even examining the merits of Streater's claim, courts have held that disturbances throughout the night in a prison facility that operates 24-hours-a-day do not constitute an Eighth Amendment violation. *Armour*, 2020 WL 2850140, at *15–16 (citing *Walker v. Nunn*, 456 F. App'x 419, 423 (5th Cir. 2011)) (dismissing prisoner's sleep deprivation claim complaining of sleep interrupted by inmate schedules, announcements made by loudspeaker, and bell ringing at count time). As such, the District Court should dismiss Streater's sleep deprivation claim.

**E. The District Court should dismiss for failure to state a claim Streater's allegations premised on violations of the ADA, RA, and Equal Protection Clause.**

*1. Equal Protection*

Streater's claim for purported violations of his right to equal protection under the Fourteenth Amendment is apparently based not only on the conditions to which he claims to have been subjected in the Smith Unit and the fact that inmates housed in high security do not receive privileges similar to those provided the general population, but also the "overall treatment" of inmates housed in high security.[7] Tr. 3:12:18–:15:00. "To state an equal protection claim, a

[7] Streater's Amended Complaint supports this understanding, as it seeks injunctive relief "prohibiting the defendants from denying [Streater] the same and/or equal treatment, rights, and/or privileges of ECB, minimum offenders not housed at an [sic] 'High Security' section of a TDCJ prison." Am. Compl. 12. An allegation contained in Streater's

plaintiff must allege that a government actor 'intentionally discriminated against the plaintiff because of membership in a protected class.'" *Reagan*, 2019 WL 6733023, at *11 (quoting *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999)). Streater has not alleged membership in a protected class with respect to his equal protection claims, only that inmates housed in high security are treated differently than those housed in general population. Such allegations are inadequate and the District Court should dismiss his claim. *See, e.g.*, *Walton v. Tex. Dep't of Criminal Justice, Institutional Div.*, 146 F. App'x 717, 718 (5th Cir. 2005) ("The mere allegation that some prisoners are paid for work, while others are not, does not establish unlawful discrimination."); *see also Kossie v. Crain*, 602 F. Supp. 2d 786, 792 (S.D. Tex. 2009) (dismissing prisoner's equal protection claim because state had legitimate interest in denying good-time credits to some offenders, and noting that equal protection claim cannot be based "solely on a personal belief that [prisoner] was a victim of discrimination"); *Davis v. Heath*, 2:06-CV-0076, 2006 WL 8445489, at *3 (N.D. Tex. Nov. 21, 2006) (observing that prisoners are not a protected class for purpose of equal protection claims), *R. & R. adopted by* 2006 WL 8445490 (N.D. Tex. Dec. 11, 2006).

*2. ADA and RA Claims*

Streater's Amended Complaint claims that Defendants Davis, TDCJ, Cubb, Harris, Unknown Telford Unit Employees, and One Unknown Classification Officer have discriminated against him on the basis of his disability in violation of the ADA and RA. Am. Compl. 6. Initially, the undersigned notes that Streater's claims against Defendants Davis, Cubb, Harris, Unknown Telford Unit Employees, and One Unknown Classification officer should be dismissed because

---

original Complaint, incorporated into his Amended Complaint by reference, indicates that his equal protection claim is premised on the belief that "similarly situated ECB offenders" in other units receive better treatment. ECF No. 1, at 14; Am. Compl. 10. Regardless, the undersigned's analysis and recommendation are unchanged.

individuals may not be sued under Title II of the ADA and RA. *Steele v. Thaler*, Civil Action No. H-09-4076, 2011 WL 739524, at *2 (S.D. Tex. Feb. 22, 2011). TDCJ is the only proper Defendant as to these claims.

Streater does not identify his alleged disability, and instead claims that he is being treated *as if he is disabled* due to his housing assignment in a heat-restricted unit. Tr. 3:16:12–:17:15. Streater's discrimination claims are, in essence, an extension of his numerous other claims raised herein pertaining to his conditions of confinement at the Smith Unit. Tr. 3:15:47–:16:11 (explaining that he based his ADA and RA claims on the same facts as those discussed throughout the hearing but was relying on different laws to bring those claims).

Title II of the ADA, which applies to public entities such as TDCJ, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Title II imposes an obligation on public entities to make reasonable accommodations or modifications for disabled persons, including prisoners." *Garrett*, 560 F. App'x at 382 (citing *Tennessee v. Lane*, 541 U.S. 509, 531 (2004) and *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998)). To state a claim under Title II of the ADA, a plaintiff must demonstrate: "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (citing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)). A qualifying disability is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "The ADA's definition of disability includes individuals

who are regarded as having such an impairment that substantially limits one or more of the major life activities." *Ariza v. Loomis Armored US, L.L.C.*, 676 F. App'x 224, 227 (5th Cir. 2017) (internal brackets and quotation marks omitted). A person qualifies as someone "regarded as" disabled if he "(1) has an impairment that is not substantially limiting but which the [defendant] perceives as substantially limiting, (2) has an impairment that is substantially limiting only because of the attitudes of others, or (3) has no impairment but is perceived by the [defendant] as having a substantially limiting impairment." *Id.* (internal quotation marks omitted).

The RA similarly provides that a disabled individual shall not "solely by reason of her or his disability . . . be denied the benefits of . . . any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "To state a claim for relief under the RA, a plaintiff must allege: '(1) the existence of a program or activity within the state which receives federal financial assistance; (2) the plaintiff is an intended beneficiary of the federal assistance; and (3) the plaintiff is a qualified handicapped person, who solely by the reason of her handicap has . . . been denied benefits from, or otherwise been subject to discrimination under such program or activity.'" *Hay v. Thaler*, 470 F. App'x 411, 417–18 (5th Cir. 2012) (quoting *Melton*, 391 F.3d at 676 n.8).

The Fifth Circuit has recognized that "[j]urisprudence interpreting either [the ADA or RA] is applicable to both." *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000). This is because "the rights and remedies afforded plaintiffs under Title II of the ADA are almost entirely duplicative of those provided under § 504 of the Rehabilitation Act." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). The causation requirements for the ADA and RA, however, differ in that the RA proscribes discrimination "solely by reason of" disability, where the ADA states that "discrimination need not be the sole reason" for the discrimination. *Id.* Under

either statute, a plaintiff must show intentional discrimination to recover compensatory damages. *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002).

Streater has not pleaded facts satisfying the elements of either an ADA or RA claim. First, Streater does not claim that he is disabled, but that TDCJ "regards" him as disabled because it has placed him in heat-restricted housing. Tr. 3:16:12–:17:15. Streater's conclusory assertion that TDCJ regards him as disabled, with no supporting allegations other than the fact that he has been placed in a housing unit primarily intended for offenders with heat restrictions, does not demonstrate that TDCJ considers him disabled. *See Rios v. Grifols Biomat USA*, CIVIL ACTION NO. 18-814-JWD-RLB, 2019 WL 4454505, at *4 (M.D. La. Aug. 29, 2019) (recommending dismissal of plaintiff's ADA claims because her allegations of being disabled were too vague and conclusory), *R. & R. adopted by* 2019 WL 4452835 (M.D. La. Sept. 17, 2019); *Lloyd v. Jones*, CASE NO. 9:18-CV-211, 2019 WL 4786874, at *6 (E.D. Tex. Sept. 10, 2019) (quoting *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010)) ("The Court does not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'").

But even assuming Streater has adequately claimed TDCJ regarded him as disabled, his allegations fall far short of sufficiently alleging that the denial of any benefits was by reason of his disability. Indeed, he sets forth *no such allegations*, except for a vague and conclusory assertion that "Lorie Davis and TDCJ discriminated against [him] based on [his] disability," and that Defendants "conspired" to discriminate against him based on his disability. Am. Compl. 6. As noted above, such indefinite allegations are inadequate to state a claim. *See Carson v. Quarterman*, Civil Action No. 6:08cv512, 2009 WL 1505389, at *5 (E.D. Tex. May 27, 2009) (dismissing plaintiff's ADA claims, noting that his "vague and conclusory claims concerning the ADA wholly

failed to enunciate a set of facts showing how any of the named defendants participated in the alleged wrongs"). As such, the District Court should dismiss these claims as well.[8]

**F. The District Court should dismiss Streater's claim that Defendants Gonzalez, Miller, Flores, and Earnest violated his First Amendment rights by not providing him with a pork-free diet upon his arrival at the Smith Unit because the meals provided did not violate the Constitution.**

Streater alleges that Defendants Gonzalez, Miller, Flores, and Earnest violated his First Amendment rights by not ensuring that he was provided a pork-free meal when he first arrived at the Smith Unit.[9] Am. Compl. 7. During the *Spears* hearing, Streater testified that he received trays containing pork products between ten and fifteen times during his "first several weeks" at

---

[8] Assuming Streater could even raise a claim for conspiracy to discriminate under the ADA and RA (*see* Am. Compl. 6), such a claim must be dismissed because the allegations of conspiracy are unadorned and unsupported. "To establish a conspiracy claim under § 1983, the plaintiff must show that there was an agreement among the alleged co-conspirators to deprive him of his constitutional rights and that such an alleged deprivation actually occurred." *Montgomery v. Walton*, 759 F. App'x 312, 314 (5th Cir. 2019). "Conclusory allegations that do not reference specific factual allegations tending to show an agreement do not suffice to state a civil rights conspiracy claim under § 1983." *Id.*

[9] It is unclear whether Streater seeks to bring this claim under the RLUIPA. Liberally construing his Complaint to assert a RLUIPA claim, it must nevertheless be dismissed. Under RLUIPA, a plaintiff may not pursue an action against a defendant in his individual capacity, nor may he successfully bring an official capacity claim against a defendant for money damages because such a claim is barred under the Eleventh Amendment. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 329, 331 (5th Cir. 2009) (holding that "RLUIPA does not create a cause of action against defendants in their individual capacities" and any award of damages against defendants in their official capacities "is barred by Texas's sovereign immunity"); *see, e.g.*, *McCreary v. Richardson*, 738 F.3d 651, 655 (5th Cir. 2013) (citing *Sossamon*, 560 F.3d at 328) ("An inmate is not entitled to monetary damages under RLUIPA for a suit brought against a correctional officer in his individual capacity."); *DeMoss v. Crain*, 636 F.3d 145, 151 (5th Cir. 2011) (quoting *Sossamon*, 560 F.3d at 331 & n.51) ("RLUIPA does not create a cause of action for damages against 'Texas and the defendants in their official capacities,' nor does it create a 'cause of action against defendants in their individual capacities.'").

Moreover, among Streater's requests for relief is an injunction precluding Defendants from denying him a pork-free diet. Am. Compl. 11. Based on Streater's testimony, his claim is fundamentally premised on problems encountered upon his initial arrival at the Smith Unit and not being placed on the pork-free-diet list. Tr. 2:11:10–:13:30. Streater admits that he is currently on the "pork-free" list and receives pork-free meals. Tr. 2:14:08–:15. Thus, Streater's desired relief has effectively been granted and the request for injunctive relief is moot. *See Castleberry v. Tex. Health & Human Servs. Comm'n*, CIVIL ACTION NO. 6:20-CV-00008, 2020 WL 3442599, at *2 (E.D. Tex. May 28, 2020) (holding inmate's request for injunctive relief seeking admission to hospital for treatment was rendered moot by his admission to hospital), *R. & R. adopted by* 2020 WL 3428995 (E.D. Tex. June 22, 2020). Insofar as Streater has occasionally not received pork-free meals since being placed on the list (Tr. 2:16:55–:17:15), isolated incidents do not "substantially burden" an inmate's free exercise of religion and the allegations would not state a claim under RLUIPA. *See Morgan v. Patterson*, Civil Action No. 2:17-CV-160, 2017 WL 7732439, at *9 (S.D. Tex. Aug. 8, 2017) (prisoner's allegations of isolated instances in which he was denied kosher meals did not constitute substantial burden on right to practice his faith), *R. & R. adopted by* 2018 WL 942458 (S.D. Tex. Feb. 15, 2018), *aff'd*, 772 F. App'x 117 (5th Cir. 2019).

the Smith Unit. Tr. 2:11:10–:12:15, 2:14:08–:15. According to Streater's allegations, each Defendant acted in the following capacities: (1) Gonzalez, Smith Unit Warden; (2) Miller, food service Captain; (3) Flores, officer who worked in food service; and (4) Earnest, Smith Unit Chaplain.[10] Am. Compl. 4.

Streater alleges that Defendants violated his right to freely exercise his religion by "failing to act to ensure" he would receive pork-free meals and by "fail[ing] to establish a written policy and/or procedure" to ensure he and prisoners like him would receive pork-free meals. *Id.* at 7–8. According to Streater's testimony, the Smith Unit has a policy that required him to be placed on a list of inmates who sought pork-free meals for religious reasons. Tr. 2:13:10–:30 (explaining that unnamed officials told him he needed to write a letter to the Warden's secretary to be placed on pork-free diet list). He claims that despite his TDCJ travel card listing him as a Muslim, he missed between ten and fifteen meals over "the first several weeks" because the trays had pork products on them, sometimes missing two meals in a single day, and that it ultimately took two months before he was permanently added to the pork-free list. Tr. 2:11:10–:12:15.

A prisoner's First Amendment rights are violated when he is not afforded "reasonable opportunity" to exercise his religious beliefs. *Davis v. Davis*, 826 F.3d 258, 265 (5th Cir. 2016) (quoting *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam)); *Adkins v. Kaspar*, 393 F.3d 559, 564 (5th Cir. 2004) (explaining that "[t]he pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith" (internal quotation marks omitted)). "Whether a prison regulation impermissibly encroaches upon a prisoner's First Amendment rights depends

[10] Dismissal of the claim against Chaplain Earnest is appropriate simply because there is no basis in Streater's allegations for concluding that he personally took any action to deny Streater a pork-free diet or that he promulgated any policy with respect to who receives a pork-free diet. "Personal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983).

upon whether it is 'reasonably related to legitimate penological interests.'" *Butts v. Martin*, 877 F.3d 571, 584 (5th Cir. 2017) (quoting *Mayfield v. Tex. Dep't of Criminal Justice*, 529 F.3d 599, 607 (5th Cir. 2008)); *see O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351–52 (1987) (holding that prison officials are not required to sacrifice legitimate penological objectives to accommodate inmates' religious practices).

Courts should consider four factors identified by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987) in determining the reasonableness of a prison regulation that allegedly impinges on a prisoner's constitutional rights:

> (1) [W]hether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it," (2) whether there exist "alternative means of exercising the fundamental right that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there is an "absence of ready alternatives" to the regulation in question.

*Adkins*, 393 F.3d at 564 (quoting *Turner*, 482 U.S. at 89–90). The Fifth Circuit has held that the first factor in the *Turner* test is the controlling question, while the remaining considerations merely aid a court in determining whether the connection between the prison regulation and the governmental interest is logical. *See Scott v. Miss. Dep't of Corr.*, 961 F.2d 77, 81 (5th Cir. 1992).

In the context of claimed religious dietary restrictions, the Fifth Circuit has repeatedly stressed that "prisons need not respond to particularized religious dietary requests to comply with the First Amendment." *Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir. 2007) (rejecting prisoner's claim that TDCJ's policy of not providing kosher meals, other than at "Jewish 'host' units," violated his First Amendment rights, citing factors such as cost and diverting resources from other penological goals); *see Kahey v. Jones*, 836 F.2d 948, 950–51 (5th Cir. 1988); *Udey v. Kastner*, 805 F.2d 1218, 1221 (5th Cir. 1986). There is a "legitimate governmental interest in running a

simplified prison food service rather than a full-scale restaurant." *Baranowski*, 486 F.3d at 122. Streater has not pleaded any facts demonstrating a claim rising to the level of a constitutional violation, i.e., a scenario beyond that already considered and rejected by the courts of this circuit. His allegations against Defendants based on the denial of a pork-free diet should therefore be dismissed. *See, e.g.*, *Newsome v. Fairly*, CIVIL ACTION NO. 1:17-cv-280-HSO-JCG, 2019 WL 2496663, at *4 (S.D. Miss. Jan. 28, 2019) (rejecting prisoner's claim that defendants' denial of his requests for a kosher diet violated his First Amendment rights based on Fifth Circuit's holding in *Baranowski*), *R. & R. adopted as modified by* 2019 WL 1128759 (S.D. Miss. Mar. 12, 2019); *Morgan*, 2017 WL 7732439, at *8 (recommending dismissal at screening prisoner's allegation that defendants violated his First Amendment rights by denying him kosher meals because his claim was "foreclosed by the holding in *Baranowski*"); *Joseph v. Ware*, Civil Action No. 07-1297, 2007 WL 4144923, at *2 (W.D. La. Oct. 22, 2007) (noting that in the Fifth Circuit, "prisons need not respond to particularized religious dietary requests," and therefore dismissing at screening prisoner's First Amendment claim based on the denial of a single kosher meal because prisoner essentially asserted "a legal interest which does not exist as he is not constitutionally entitled to a pork-free diet").

**G. The District Court should dismiss Streater's claim regarding receiving meal trays containing food to which he is allergic because he has not adequately alleged facts demonstrating deliberate indifference by Defendants in failing to promulgate a policy to prevent such occurrences.**

Streater alleges that Defendants Gonzalez, Miller, Flores, and TDCJ[11] violated his rights by failing to establish policies that ensure inmates with medically-imposed dietary restrictions

[11] With respect to this claim, TDCJ is immune from suit and the claim against it should be dismissed. "The Eleventh Amendment bars suit against a state entity . . . regardless of whether money damages or injunctive relief is sought." *Voisin's Oyster House, Inc. v. Guidry*, 799 F.2d 183, 186 (5th Cir. 1986) (citing *Cory v. White*, 457 U.S. 85, 90–91 (1982)). As such, Streater's claim is barred by Eleventh Amendment sovereign immunity regardless of the relief he seeks, and dismissal of his claim is appropriate on that basis. *See Talib*, 138 F.3d at 213 ("As an instrumentality of

receive meal trays containing food that does not violate such restrictions. Am. Compl. 8. Although his medical files show that he is allergic to beans and peanuts, Streater claims he receives a lunch and dinner tray every day that contains at least one bean or peanut product. Tr. 2:40:30–:50, 2:41:10–:30. Streater asserts that this harms him because, even though he does not eat these items, he is "not getting what [he] is entitled to" in the form of full meals. Tr. 2:43:05–:15. Streater denies, however, suffering any allergic reactions due to the presence of bean or peanut products on his meal trays. Tr. 2:40:50–:41:10.

"Liability for failure to promulgate [a] policy . . . require[s] that the defendant have acted with deliberate indifference." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). "Deliberate indifference is a stringent standard of fault, requiring proof that a [defendant] disregarded a known or obvious consequence of his action." *Id.* at 446–47 (internal brackets and quotation marks omitted). Deliberate indifference is shown only where the defendant had "actual or constructive notice" (*id.* at 447) such that the failure to promulgate a policy amounts to an "intentional choice."[12] *Brumfield v. Hollins*, 551 F.3d 322, 328 (5th Cir. 2008).

Per Streater's allegations, it appears the only Defendant with any notice regarding this issue was Defendant Flores, who would have no apparent policymaking authority given his position as a correctional officer, and for whom Streater alleges no facts demonstrating same.[13] Am. Compl. 2; Tr. 2:46:30–:47:00. Given that Streater's allegations do not show that either Captain Miller or

---

the state, the TDCJ[] is immune from a suit for money damages under the Eleventh Amendment."); *Sowell v. TDCJ*, Civil Action No. H-20-1492, 2020 WL 2113603, at *1 (S.D. Tex. May 4, 2020) (dismissing prisoner's claim for injunctive relief against TDCJ and TDCJ Estelle Medical Department because they are immune from suit under the Eleventh Amendment).

[12] The Fifth Circuit noted that placing stringent requirements on claims of this nature is necessary to ensure that such claims do not become "*de facto respondeat superior* liability." *Porter*, 659 F.3d at 447.

[13] During the *Spears* hearing, Streater indicated that he sent I-60s to Defendant Miller regarding the issue, but he learned that she was apparently no longer working in the kitchens at the time of his complaints, and he never received a response to those I-60s. Tr. 2:45:05–:46:35. Streater testified that he never sent any I-60s to Defendant Gonzalez regarding this issue. Tr. 2:45:05–:15, 2:45:55–:46:30.

Warden Gonzalez had actual notice of the food-allergen issue, i.e., the alleged problem they should have promulgated a policy to address, there is no allegation supporting a finding that either Defendant was deliberately indifferent and, as a result, the District Court should dismiss this claim.

The undersigned further notes that Streater's claim regarding being served meal trays containing foods to which he is allergic likely does not violate his constitutional rights. Streater's claim of harm is simply an allegation that he is not receiving what he thinks he should receive, which is presumably full meals without the presence of foods he cannot eat; however, "[t]he [E]ighth [A]mendment [only] requires that jails provide inmates with well-balanced meal[s], containing sufficient nutritional value to preserve health." *Green v. Ferrell*, 801 F.2d 765, 770 (5th Cir. 1986) (internal quotation marks omitted) (reversing district court decision requiring jail to serve three meals per day, concluding that only two meals per day satisfies constitutional requirements). Streater's testimony indicates that he was able to eat most of the food served to him, and that he only avoided eating those foods to which he was allergic. Tr. 2:41:51–:58. Taking his allegations at face value, it appears that Streater received between two and three full meals per day. Moreover, Streater also stated that he never had an allergic reaction due to being served such foods (Tr. 2:40:50–:41:10), and he does not allege—and the medical records do not show—any notable weight loss arising from not eating the meals in their entirety.[14] In *Johnson v. Bone*, the

[14] Streater's allegation in his original Complaint, incorporated by reference in the Amended Complaint, that he lost fourteen pounds in six days upon first arriving at the Smith Unit, requires no different result. ECF No. 1, at 10; Am. Compl. 10. The authenticated medical records clearly contradict that allegation, showing that he lost only six pounds over a seven-day period when he first arrived at the Smith Unit. *Banuelos*, 41 F.3d at 234 (holding that courts may dismiss prisoners' *in forma pauperis* claims as frivolous based on "medical and other prison records if they are adequately identified or authenticated" (internal quotations omitted)). Streater further admitted that this is the period in which he was refusing to eat multiple meals per day because they were not pork-free. Tr. 2:11:10–:12:15 (claiming that he missed ten to fifteen meals in the first several weeks following his arrival at Smith Unit). Insofar as Streater has alleged "starvation" arising from that first week, the undersigned recommends dismissing that claim because Streater (1) was provided adequate meals and nourishment and (2) simply did not eat the meals provided. *See Talib*, 138 F.3d at 214 n.3 (stating that, in general, only a "continuous and substantial denial of food" will establish a constitutional violation); *Justice v. Kennedy*, C.A. No. C-12-005, 2012 WL 4718633, at *7 (S.D. Tex. Sept. 12, 2012) (citing *Baranowski*, 486 F.3d at 121–22) (dismissing prisoner's Eighth Amendment claim alleging inadequate diet

prisoner claimed he did not receive an adequate diet because he was allergic to numerous foods and did not receive a diet that complied with those restrictions. Civil Action No. 9:04cv108, 2006 WL 2052657, at *1 (E.D. Tex. July 21, 2006). In response, medical officials simply advised the prisoner "to not eat the foods to which he is allergic." *Id.* Noting that the Fifth Circuit merely requires inmates receive "reasonably adequate food" (*id.* at *5 (quoting *Berry*, 192 F.3d at 507)), the magistrate judge recommended dismissal of the prisoner's claim (which the district court adopted) because he had not alleged any harm arising from being served foods to which he was allergic. *Id.* at *2, *6. Such analysis is instructive in this case and similarly requires dismissal.

**H. The District Court should dismiss Streater's claim regarding "inmate locator reports" because he does not allege facts demonstrating deliberate indifference in failing to promulgate a policy.**

Streater's Amended Complaint alleges that Defendants Gonzalez, Davis and TDCJ[15] "failed to establish an adequate policy and procedure to ensure the disposal of 'Inmate Locator Reports,'" which he claims has led to prisoners having access to the reports and thus enabling them to "google" other offenders, which allegedly "expos[es] offenders to extortion and harm." Am. Compl. 9. Streater's claim should be dismissed for two reasons. First, since his claim is premised on the alleged failure to promulgate policies, Streater must show that Defendants acted with deliberate indifference. *Porter*, 659 F.3d at 446. Streater has not alleged that either Defendant Gonzalez or Davis had actual notice of any issues concerning "Inmate Locator Reports" being left in places where inmates could access them. Second, and more fundamentally, Streater pleads no facts showing injury or harm to *himself* (as opposed to a generalized grievance asserted on behalf of other inmates) due to the lack of any policy. This claim should be dismissed as well.

---

arising from failure to provide pork-free diet that conformed with religious requirements because he was not denied food, even though prisoner lost fifteen pounds).

[15] As previously discussed, TDCJ is immune from suit under § 1983 and the claims against it should be dismissed. *Guidry*, 799 F.2d at 176; *Talib*, 138 F.3d at 213; *Sowell*, 2020 WL 2113606, at *1.

**I. The District Court should dismiss Streater's vague and unadorned claim for intentional infliction of emotional distress because it is frivolous.**

Streater includes in his Amended Complaint an allegation that he was subjected to "[i]ntentional infliction of emotional distress, fear, and mental anguish." Am. Compl. 11. At the *Spears* hearing, Streater simply stated that he based this claim on the facts discussed during the hearing. Tr. 3:11:42–:12:15.

"There are four elements to a claim of intentional infliction of emotional distress: (1) defendant acted intentionally or recklessly; (2) defendant's conduct was extreme and outrageous; (3) defendant's actions caused plaintiff emotional distress; and (4) plaintiff's emotional distress was severe." *Fuller v. Brownsville Indep. Sch. Dist.*, Civil Action No. B: 13-109, 2016 WL 3960563, at *9 (S.D. Tex. May 18, 2016) (citing *Twyman v. Twyman*, 855 S.W.2d 619, 621–22 (Tex. 1993)). Additionally, a defendant's "conduct must be so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at *15 (internal quotation marks omitted). Streater has set forth no factual allegations demonstrating he suffered severe emotional distress, much less mental anguish resulting from any Defendant's severe and outrageous conduct. As such, the District Court should dismiss this claim.

**J. The District Court should dismiss Streater's claims of retaliation and conspiracy against Defendants Cubb, Harris, Unknown Telford Unit Employees, and One Unknown Classification Officer in regard to his transfer to the Smith Unit, the removal of his medical restrictions, and the modification of his work assignment.**

Streater grounds his retaliation and conspiracy claims on his belief that Defendants Cubb, Harris, Unknown Telford Unit Employees, and One Unknown Classification Officer, are retaliating against him for a lawsuit he filed while housed at TDCJ's Eastham Unit. Am. Compl. 4–5; Tr. 2:23:40–:24:20, 2:25:10–:50, 2:32:50–:34:40. Specifically, Streater alleges these

Defendants conspired and retaliated by transferring him from the Telford Unit to the Smith Unit, removing his medical restrictions, and modifying his work assignment. Am. Compl. 4–5.

A plaintiff must demonstrate the following to establish a claim for retaliation: "(1) the existence of a specific constitutional right; (2) the defendant's intent to retaliate for the exercise of that right; (3) a retaliatory adverse act; and (4) causation." *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 863 (5th Cir. 2004) (citing *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995)). Conclusory allegations, including a prisoner's personal belief that he is the victim of retaliation, are insufficient to support a claim for retaliation. *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999) (citing *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997)). Instead, "'[t]he inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred.'" *Haddix v. Kerss*, 203 F. App'x 551, 554 (5th Cir. 2006) (quoting *Woods*, 60 F.3d at 1166). To constitute a retaliatory act, the prison official's conduct must be "capable of deterring a person of ordinary firmness from further exercising his constitutional rights." *Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006). "Disciplinary segregation and loss of privileges may constitute an adverse act." *Brunson v. Nichols*, 875 F.3d 275, 277 (5th Cir. 2017) (citing *Hart v. Hairston*, 343 F.3d 762, 763–64 (5th Cir. 2003)). Causation requires a showing that the alleged adverse act would not have occurred absent the retaliatory motive. *McDonald v. Stewart*, 132 F.3d 225, 231 (5th Cir. 1998) (quoting *Johnson*, 110 F.3d at 310). In evaluating such claims, the Fifth Circuit has cautioned that "prisoners' claims of retaliation are regarded with skepticism" and should be "carefully scrutinized by the courts." *Adeleke v. Fleckenstein*, 385 F. App'x 386, 387 (5th Cir. 2010) (citing *Woods*, 60 F.3d at 1166).

"To establish a conspiracy claim under § 1983, the plaintiff must show that there was an agreement among the alleged co-conspirators to deprive him of his constitutional rights and that such an alleged deprivation actually occurred." *Montgomery*, 759 F. App'x at 314. "Conclusory allegations that do not reference specific factual allegations tending to show an agreement do not suffice to state a civil rights conspiracy claim under § 1983." *Id.*

Notably, all of the persons involved in Streater's pending Eastern District of Texas litigation—which he claims to be the source of these Defendants' retaliatory motive—are TDCJ officials who work *at the TDCJ Eastham Unit*. The named Defendants herein have no demonstrable connection to those defendants, other than their shared employer. *See Streater v. Allen*, Civil Action No. 9:15-cv-00068-MJT, ECF No. 5, at 1–2 (E.D. Tex. July 10, 2015). Further, Streater filed his Notice of Appeal in that case in September 2018, but his transfer to the Smith Unit occurred more than a year later. *Id.* at ECF No. 132 (E.D. Tex. Sept. 13, 2018); Am. Compl. 4; Tr. 2:23:40–:24:20. Streater admits he does not know who made the decision to transfer him to the Smith Unit, but he nevertheless believes retaliation motivated the move because he was told the reason for the transfer was heat restrictions, which he denies having. Tr. 2:29:08–:30:15. To bolster his claim, Streater alleges Defendant Harris "work[ed] with" the classification officer that he sued in the Eastern District case but provides no facts supporting this conclusion. Tr. 2:32:50–:34:40.

Insofar as he claims that Defendants conspired against him, Streater provides nothing more than his opinion, and he alleges no facts that tend to show an agreement among the Defendants to deprive Streater of his rights. In sum, Streater's claims of retaliation and conspiracy surrounding his transfer to the Smith Unit, removal of his medical restrictions, and modification of his work assignment, are based on bare conjecture and his personal belief that he was the victim of

retaliation by TDCJ officials. Dismissal of these claims is therefore appropriate. *See Coronado v. Lennox*, Civil Action No. 5:12-CV-00044-BG, 2012 WL 7005384, at *2 (N.D. Tex. Oct. 15, 2012) (citing *Trevino v. Gutierrez*, 426 F. App'x 327, 330 (5th Cir. 2011)) (recommending dismissal of prisoner's retaliation claim premised on nothing more than prisoner's personal belief that he was victim of retaliation), *R. & R. adopted by* 2013 WL 440149 (N.D. Tex. Feb. 5, 2013).

**K. The District Court should dismiss Streater's claims of deliberate indifference to serious medical needs against Defendants Cubb, Harris (in her supervisory capacity), and Unknown Telford Unit Employees arising from the elimination of Streater's medical restrictions and modification of his work assignments.**

Streater claims that Defendants Cubb, Harris, Unknown Telford Unit Employees, and One Unknown Classification Officer[16] were deliberately indifferent to his medical needs regarding his medical restrictions and work assignment. Am. Compl. 4–5. Streater's claim against Defendant Cubb focuses on the decision to remove Streater's medical restrictions. Tr. 2:30:30–:32:00. Because he does not know who made the decision to modify his work assignments, Streater appears to bring his claim against Defendant Harris simply because she is "in charge" of the classification department. Tr. 2:38:15–:30. With respect to the Unknown Telford Unit Employees, Streater provides no allegations regarding what role they might have played in the removal of his restrictions or in his work assignment, and the District Court should therefore dismiss Streater's claim against them. *See Thompson*, 709 F.2d at 382 ("Personal involvement is an essential element of a civil rights cause of action."). Concerning the substance of his claim, Streater alleges that, while placed in the unrestricted work assignment, he performed work that "exacerbated" injuries in his neck and back, which caused significant pain. Tr. 2:36:10–:37:00.

[16] The undersigned addresses the claim against One Unknown Classification Officer in a later section.

*1. Defendant Cubb*

Under the Constitution, prison officials have a duty to provide adequate medical care. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). An inmate seeking to establish an Eighth Amendment violation in regard to medical care must allege facts showing that prison officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)) (explaining that because "only the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs" (emphasis in original)). Deliberate indifference "is an extremely high standard to meet" (*Brewster*, 587 F.3d at 770 (quotations omitted)), and requires satisfaction of both an objective and a subjective component. *Rogers*, 709 F.3d at 410. An inmate must first prove objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). As to the subjective component, a prison official acts with deliberate indifference only where he (1) knows the inmate faces a substantial risk of serious harm and (2) disregards that risk by failing to take reasonable measures to abate it. *Id.* at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (stating that prison official is not liable for denial of medical treatment unless he knows of and disregards an excessive risk to inmate health or safety).

A prison official's "failure to alleviate a significant risk that the official should have perceived, but did not, is insufficient to show deliberate indifference." *Domino*, 239 F.3d at 756 (quoting *Farmer*, 511 U.S. at 838) (alterations and internal quotation marks omitted). "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 459. Instead, a prison official "must both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Lawson*, 286 F.3d at 262 (holding that deliberate indifference is a "subjective inquiry," and inmate must show prison official was actually aware of risk of harm and consciously ignored it).

The authenticated records indeed show that Defendant Cubb, on November 11, 2019, removed many of Streater's medical restrictions, including limitations pertaining to standing, lifting more than twenty pounds, bending at the waist, and reaching over the shoulder, and the need for ground floor housing. They also show that Defendant Cubb reviewed these restrictions "per TDCJ guidelines." The basis for Defendant Cubb's decision is unknown, and it is also undetermined why Defendant Cubb reviewed Streater's restrictions after his transfer to the Smith Unit. Nonetheless, even assuming Defendant Cubb incorrectly removed Streater's restrictions—and it appears their removal was erroneous, given their apparent reinstatement three days later (Tr. 2:30:58–:32:00)—such a claim amounts to little more than negligence and Streater's claim should be dismissed. *See Chapman v. Pace*, 353 F. App'x 955, 957 (5th Cir. 2009) (affirming dismissal of prisoner's claim that physician's assistant inappropriately removed prisoner's medical restrictions leading to work assignment that aggravated injuries because physician's assistant was, at most, negligent). In addition, even assuming a more nefarious motive in Defendant Cubb's temporary removal of Streater's work restrictions over that three day period, Streater alleges no facts showing anything beyond de minimis injury, thus providing another ground for dismissal.

2. *Defendant Harris*

Insofar as Defendant Harris is concerned, Streater's only apparent basis for naming her as a Defendant concerning this claim is that she is "in charge" of classification (*see* Tr. 2:38:15–:30),

and that "someone" in classification refused to reinstate his medically-restricted work assignment after Dr. McClure reinstated his medical restrictions. Tr. 2:36:10–:37:00, 2:38:15–:39:02.

It is well established that a supervisory official is not liable for the acts of her subordinates unless: (1) she affirmatively participated in an act that caused a constitutional deprivation, or (2) she implemented an unconstitutional policy that resulted in injury to the plaintiff. *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992) (citing *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987)). A plaintiff must sufficiently allege facts showing either personal involvement or implementation of an unconstitutional policy to make a supervisor responsible under § 1983, as supervisors "are not liable for the actions of subordinates on any theory of vicarious liability." *Thompkins*, 828 F.2d at 303.

Here, Streater sets forth no facts showing that Defendant Harris was personally involved in the decisions regarding his work assignments. In fact, during the *Spears* hearing, Streater's testimony indicated that he is suing Defendant Harris *because* she is in charge of the classification department and that he does not know who made the actual decisions pertaining to his work assignments. Tr. 2:38:15–:39:02. As such, the District Court should dismiss the claim against Defendant Harris insofar as it is made against her in her supervisory capacity.

**L. The District Court should dismiss Streater's claim against Defendant One Unknown Classification Officer because he fails to allege facts demonstrating deliberate indifference to Streater's serious medical needs in relation to the work assignment.**

Streater's claim against Defendant One Unknown Classification Officer is premised on the same facts as his claim against Defendant Harris, but instead of naming the supervisor of the classification department, he names the unknown classification officer who allegedly responded to his complaints regarding his work assignment. Streater's testimony reveals that he does not know who made the decision, and that the responses to his complaints went unsigned. Tr. 2:36:10–

:37:00, 2:38:15–:39:02. Streater claims that, while placed in the unrestricted work assignment, he performed work that "exacerbated" injuries in his neck and back, which caused significant pain. Tr. 2:36:10–:37:00.

"Work is a typical condition of confinement expected of Texas prisoners." *Reaves v. Voglegesang*, Civil Action No. 5:10–CV–044–BG, 2010 WL 8445306, at *4 (N.D. Tex. Nov. 23, 2010), *R. & R. adopted by* 2012 WL 666205 (N.D. Tex. Feb. 29, 2012), *aff'd* 517 F. App'x 233 (5th Cir. 2013); *see Walton*, 146 F. App'x at 718 ("Compelling an inmate to work without pay does not violate the Constitution even if the inmate is not specifically sentenced to hard labor."). Prison officials can require prisoners to work absent "deliberate indifference toward their physical condition." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). To establish a deliberate indifference claim based on an alleged unconstitutional work assignment, a prisoner must show that: (1) "the work significantly aggravated" his medical condition; and (2) the defendants knew such aggravation would occur but ignored that fact. *Reaves*, 2010 WL 8445306, at *4. "The deliberate-indifference standard is designed to be stringent enough to separate acts or omissions that amount to intentional choices from those that are merely unintentionally negligent oversights." *Vaughn v. Massie*, Civil Action No. 3:16-CV-21, 2018 WL 791383, at *5 (S.D. Tex. Feb. 7, 2018). As such, the prison officials' behavior must rise above "mere negligence." *Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989). Thus, a prisoner must demonstrate that officials knowingly placed him on a work detail that they knew would significantly aggravate his serious medical condition. *Id.*

Per Streater's allegations, he told the classification department that he had medical restrictions, and they sent back an unsigned letter stating that he did not have any such restrictions. Tr. 2:28:15–:39:02. Even accepting these assertions at face value, such a claim falls noticeably

short of establishing deliberate indifference on the part of the Unknown Classification Officer. First, Streater supplies no facts demonstrating *when* he allegedly (1) advised the classification department of his medical restrictions or (2) received its response. If these events occurred during the three day period prior to Dr. McClure reinstating his restrictions, the department's response was accurate and cannot support a finding of deliberate indifference. Second, Streater provides no facts showing the manner in which he made the alleged communication (verbally, in writing, etc.)[17] or identifying the content of such communication, e.g., did it specifically identify his medical restrictions or simply state he had "restrictions." Because Streater offers no specific factual assertions demonstrating the transmission of information to the classification department sufficient to show knowledge of (1) a specific medical condition (2) that would be aggravated by the work assigned, he has failed to demonstrate that unknown "officials knowingly put [him] on a work detail which they knew would significantly aggravate his serious" medical condition. *Jackson*, 864 F.2d at 1246. Under these circumstances, Streater's allegations are simply too vague to show deliberate indifference on the part of anyone in the classification department who made the decision to maintain his work assignment, even if the decision was made after reinstatement of the medical restrictions by Dr. McClure on November 14, 2019. Most favorably construed, it appears Streater arguably presents a negligence claim against classification department officials in that perhaps they *should have known* Streater should not have been working in the assignment he had been given. *See Redfern v. Carillo*, Civil Action No. G-05-457, 2009 WL 416296, at *5 (S.D. Tex. Feb. 18, 2009) (holding that prisoner's allegations did not reflect defendants "consciously

[17] Streater presumably did not provide notice of this issue through filing a grievance—his testimony states that he filed only one grievance, relating to a typewriter that was damaged in the course of his transfer from Telford Unit to Smith Unit.

assigned" prisoner to work assignment knowing that it would aggravate his knee and foot problems).

**M. The District Court should order Defendant Gonzalez, in his official capacity, to answer Streater's claim under the RLUIPA that he is forced to choose between eating lunch on Fridays and attending Jumu'ah.**

Streater alleges that since his arrival at the Smith Unit in November 2019, he has been forced to choose between attending Jumu'ah (Friday Prayers) or eating lunch. Am. Compl. 8; Tr. 2:21:20–:25. Streater testified that on Fridays, inmates are brought out of their cells to attend services around 10:30 a.m., and the food cart serving lunch arrives while they are out for services, forcing him to choose between attending services or eating. Tr. 2:19:00–:20:40. Streater blames Defendant Warden Gonzalez for not establishing a policy that would prevent such conflicts. Am. Compl. 8. Streater seeks injunctive relief under the RLUIPA, naming Defendant Gonzalez in his official capacity.[18] Am. Compl. 4, 12.

The "RLUIPA requires that prison officials refrain from (1) substantially burdening an inmate's free exercise of his religion unless, when strictly scrutinized, (2) the burden 'is in furtherance of a compelling governmental interest' and 'is the least restrictive means of furthering that compelling interest.'" *Sossamon*, 560 F.3d at 331 (quoting 42 U.S.C. § 2000cc–1(a) (2006)).

[18] To the extent Streater seeks monetary damages under the RLUIPA, such a claim must be dismissed. *See Sossamon*, 560 F.3d at 229, 331 (holding that "RLUIPA does not create a cause of action against defendants in their individual capacities" and any award of damages against defendants in their official capacities "is barred by Texas's sovereign immunity"). Further, although Streater names Defendants Miller, Flores, and Earnest in connection with this claim, the undersigned notes that Defendant Miller is apparently no longer employed as a Captain in the food services department, meaning she cannot provide the relief Streater seeks, and Defendants Flores and Earnest, respectively a correctional officer who works in the kitchens and a Chaplain, have no demonstrated policymaking authority regarding when prisoners are given the opportunity to eat lunch, meaning they cannot provide the relief Streater seeks. As such, the undersigned recommends dismissing Streater's RLUIPA claims against them. *See Martinez v. Richardson*, CIVIL ACTION NO. 6:15cv732, 2017 WL 9289644, at *15 (E.D. Tex. Jan. 19, 2017) (recommending grant of summary judgment as to injunctive relief claims against warden and chaplain because prisoner failed to provide evidence that they possessed authority to grant him an exemption from TDCJ grooming policies), *R. & R. adopted by* 2017 WL 525768 (E.D. Tex. Feb. 8, 2017); *Broussard v. Stephens*, Civil Action No. 2:13-CV-00211, 2014 WL 7188781, at *4–5 (S.D. Tex. Dec. 16, 2014) (adopting recommendation to dismiss prisoner's claims for injunctive relief because defendants lacked authority to change TDCJ policy or prevent enforcement of policies).

With respect to whether the government substantially burdens an inmate's free exercise of religion, the Fifth Circuit has stated:

> [G]overnment action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs. And, in line with the foregoing teachings of the Supreme Court, the effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs.

*Adkins*, 393 F.3d at 570.

According to Streater's allegations, he is forced to choose between eating and attending prayer services. Accepted as true, this claim falls distinctly within the realm of forcing Streater to choose between violating his religious beliefs and enjoying the generally available benefit of eating lunch that, in this context and for screening purposes, the undersigned finds not to be trivial. *See Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 794 (5th Cir. 2012) ("Where an inmate is denied a generally available benefit because of his religious beliefs, a substantial burden is imposed on him."). Such determinations are "fact-specific and require[] a case-by-case analysis." *Id.* at 791 (internal quotation marks omitted). Once the inmate demonstrates a substantial burden on his religious exercise, "the burden shifts to the government to show that its action or policy is the least restrictive means of furthering a compelling interest." *Brown v. Collier*, 929 F.3d 218, 229 (5th Cir. 2019) (internal quotation marks omitted). As such, the undersigned recommends that the District Court order Defendant Warden Gonzalez, in his official capacity as Warden of the Smith Unit, to answer Streater's claim for injunctive relief under the RLUIPA.[19]

[19] To the extent Streater alleges that these circumstances violate his rights under the First Amendment's Free Exercise Clause, the District Court should dismiss that claim because Streater premises his claim on Defendants' alleged failure to promulgate a policy that would ensure he would receive an opportunity to attend prayer services and eat lunch. *See* Am. Compl. 8. As discussed above, such claims are judged on a "deliberate indifference" standard that requires "actual or constructive notice" of the issue. *Porter*, 659 F.3d at 446–47; *Brumfield*, 551 F.3d at 328. Streater does

## IV. Recommendation

For these reasons, the undersigned recommends that the United States District Court dismiss with prejudice Streater's claims pertaining to: (1) the grievance process; (2) PREA violations; (3) his housing assignment; (4) his classification; (5) failure to protect; (6) his cell conditions; (7) food quality, preparation, and distribution; (8) inmate locator reports; (9) sleep deprivation; (10) equal protection; (11) the ADA and RA; (12) the First Amendment's Free Exercise Clause; (13) meals containing items to which he is allergic; (14) IIED; (15) retaliation; (16) conspiracy; (17) deliberate indifference with respect to his medical restrictions and work assignment as they pertain to Defendants Cubb, Harris (in her supervisory capacity) and Unknown Telford Unit Employees; (18) deliberate indifference of One Unknown Classification Officer relating to Streater's claimed serious medical needs and resulting work assignment; and (19) RLUIPA claims seeking monetary damages. The undersigned further recommends that the United States District Court dismiss without prejudice Streater's claim for injunctive relief under the RLUIPA regarding a pork-free diet (*see supra* note 9) as well as his claim against Defendant Rebber regarding his mail. *See supra* p. 14–15.[20]

As to Streater's remaining RLUIPA claim in which he seeks injunctive relief against Defendant Warden A. Gonzalez, in his official capacity as Warden of the Preston E. Smith Unit, for allegedly having to choose between eating lunch and attending Friday prayer services, the

---

not allege that Defendants Gonzalez, Miller, or Flores had such knowledge. Streater claims he discussed the issue with Defendant Earnest and Assistant Warden Miller. Tr. 2:21:25–:22:10. As the undersigned noted in discussing Streater's injunctive relief claim under the RLUIPA, Defendant Earnest is a Chaplain with no apparent policymaking authority concerning when prisoners may eat lunch. Assistant Warden Miller is not named as a Defendant. As such, no one with the authority to promulgate a policy that Streater believes should have been promulgated had the requisite knowledge to demonstrate deliberate indifference to Streater's rights under the First Amendment.

[20] Streater also confirmed at the *Spears* hearing he wished to withdraw his access to courts claim, having included it in his Original Complaint but omitting it from the Amended Complaint. Tr. 2:08:00-:40. Thus, he has similarly abandoned the claim.

undersigned recommends that the United States District Court order Defendant Gonzalez to answer or otherwise respond herein.

## V. Right to Object

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2016); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding, conclusion, or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: July 21, 2020.

**D. GORDON BRYANT, JR.**
**UNITED STATES MAGISTRATE JUDGE**